# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

----------------------------

UNITED STATES OF AMERICA,
APPELLEE

- V. -

DILKHAYOT KASIMOV,
DEFENDANT-APPELLANT

-------------------------

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

## OPENING BRIEF
## FOR DEFENDANT-APPELLANT

/s/ AMITH GUPTA

AMITH GUPTA, ESQ.,
AMERICAN TRIAL LAW LITIGATORS, LLC
925B PEACHTREE ST. NE #2151
ATLANTA, GA 30309
E-MAIL: AMITHRGUPTA+LAW@GMAIL.COM
PHONE: 408-355-5782
ON BEHALF OF THE COALITION FOR CIVIL
FREEDOMS

*ATTORNEY FOR DEFENDANT-APPELLANT*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………...……………….………….5

JURISDICTIONAL STATEMENT…………………………………….…..9

ISSUES PRESENTED………………………………………………………..9

SUMMARY OF THE ARGUMENT…………………………………………... 10

STATEMENT OF FACTS…………………………………………...…………12

I) Background to the Investigation………………………………….…………12

II) The Armed Conflict in Syria and the Rise of ISIS………………...………..13

III) Habibov and the Tea Party……………………………...………………………17

IV) Dilkhayot Kasimov…………………………………………...……………19

    IV.A) Kasimov's Relationships with Habibov and Others…………………19

    IV.B) Kasimov's Alleged Involvement in the Plot to Send Saidakhmetov to
    Fight for ISIS……………………………………………………………..23

V) Ex Parte Discussions Involving Kasimov's Conflict With Trial Counsel and
Desire to Testify…………………………………………………...……………31

VI) First Amendment Jury Charge Instruction Denied……………………………37

VII) Conviction & Sentencing with "Terrorism Enhancement"…………………..38

ARGUMENT…………………………………………………………..………42

I) Kasimov was deprived of his fundamental right to testify due to the district
court's admonitions.………………………………………………..………...42

2

II) Evidence of Kasimov's mental state was insufficient to establish that he held the requisite knowledge of supporting ISIS............……………………………..47

II.A) Preliminary Issues……………………………………………………47

II.A.1) Standard of Review and Statutory Framework………………47

II.A.2) Direct Evidence Failed to Prove or Contradicted Kasimov's Alleged Knowledge, and The Government's Case Was Entirely Circumstantial…………………………………………………………...53

II.A.3) The Specifics of Kasimov's Alleged Offense Conduct and the Situation in Syria…………………………………………………..56

II.B) The Government's References to Coded Language Are Not Sufficiently Probative of Kasimov's Knowledge of Supporting ISIS Where Even a Co-Conspirator Would Not Have Understood Them to be Codes and Where Kasimov's Reactions Do Not Reasonably Indicate So……………..57

II.C) Political Views and Statements Expressed By or Attributed to Kasimov Are Insufficient to Prove the Requisite Mental State………………….…65

II.D) Kasimov's Interactions with Co-Conspirators Does Not Establish Requisite Knowledge or Intent……………………………………….…..69

II.D.1) Co-Conspirators other than Habibov…………………………70

II.D.2) Kasimov's Interactions with Habibov Specifically…………...72

II.E) The ISIS Videos on Kasimov's Phone Are Not Probative Where the Government's Case Indicated that Such Videos were Shared Widely By Mainstream Outlets and No Evidence Was Put Forward Establishing How or Why They Were on His Device…………………………………………..74

II.F) Kasimov's Alleged Eagerness and Other Vague Signs of Support Fail to Establish the Requisite Knowledge………………………………….…...78

I.G) The Totality of the Evidence Does Not Salvage Its Insufficient Character…………………………………………………………….……...78

II.H) Preservation…………………………………………………………...80

III) Evidence of Kasimov's mental state was also insufficient to establish that he held the requisite knowledge that ISIS was designated as a foreign terrorist organization, or engaged in terrorism, or engaged in terrorist activity…………...80

IV) The district court wrongly denied a First Amendment jury instruction………84

V) Kasimov's sentence should be reduced to time served where the "terrorism enhancement" was incorrectly applied…………………………………………86

CONCLUSION………………………………………………...……………88

CERTIFICATE OF COMPLIANCE………………………..……………………89

# TABLE OF AUTHORITIES

Cases:

Brown v. Artuz, 1997 U.S. App. LEXIS 34018 (2d Cir. 1997)………………42, 43

Chang v. United States, 250 F.3d 79 (2d Cir. 2001)................…...………………47

Dawson v. Delaware, 503 U.S. 159 (1992)……………………………………85

Dean v. Clinton Correctional Facility, 93 F.3d 58, 62 (2d Cir. 1996)……………43

In re: Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh,

     552 F.3d 93 (2d Cir. 2008)………………………………………….....76

Jackson v. Virginia, 443 U.S. 307 (1979)…………………………………….48

McCoy v. Louisiana, 138 S. Ct. 1500 (2018)……………………………….....47

Messina v. United States, 2020 U.S. Dist. LEXIS 128647 (N.Y.E.D. 2020)……..47

Rock v. Arkansas, 483 U.S. 44 (1987)…………………………………………42

Sullivan v. Louisiana, 508 U.S. 275 (1993)…………………………………….48

United States v. Al Jabori, 90 F.3d 22 (2d Cir. 1996)……………………………49

United States v. Alhaggagi, 978 F.3d 698 (9th Cir. 2020)………………………...75

United States v. Aref, 2007 U.S. Dist. LEXIS 12228 (N.D.N.Y. 2007)…………..65

United States v. Autuori, 212 F.3d 105 (2d. Cir. 2000)…………………………...48

United States v. Bifield, 702 F.2d 342 (2d Cir. 1983)…………………………42

United States v. Banol-Ramos, 516 Fed. Appx. 48 (2d Cir. 2013)………………..87

United States v. Capers, 20 F.4th 105 (2d. Cir. 2021)……………………………48

United States v. Caronia, 703 F.3d 149 (2d Cir. 2012)……………………………85

United States v. Di Stefano, 555 F.2d 1094 (2d Cir. 1977)………………………52

United States v. Espaillet, 380 F.3d 713 (2d Cir. 2004)…………………………...48

United States v. Farhane, 634 F.3d 127 (2d Cir. 2011)………………………...52, 65

United States v. Friedman, 300 F.3d 111 (2d Cir. 2002)…………………………...50

United States v. Ghayth, 709 Fed. Appx. 718 (2d Cir. 2017)……………………...70

United States v. Glenn, 312 F.3d 58 (2d Cir. 2002)………………………………49

United States v. Joelson, 7 F.3d 174 (9th Cir. 1993)…………………………..43-45

United States v. Jones, 393 F.3d 107 (2d Cir. 2004)……………………………...48

United States v. Kaziu, 559 Fed. Appx. 32 (2d Cir. 2014)……………………..84-85

United States v. Labat, 905 F.2d 18 (2d Cir. 1990)………………………….....57-58

United States v. Lorenzo, 534 F.3d 153 (2d Cir. 2008)………………………..48-49

United States v. Martinez, 937 F.2d 299 (7th Cir. 1991)…………………………48

United States v. McCrimon, 788 F.3d 75 (2d Cir. 2015)…………………………87

United States v. Miller, 527 F.3d 54 (3d Cir. 2008)………………………………76

United States v. Nusraty, 867 F.2d 759 (2d Cir. 1979)……………………………51

United States v. Ogando, 547 F.3d 102 (2d Cir. 2008)………………………...50-51

United States v. Pinckney, 85 F.3d 4 (2d Cir. 1996)………………………………50

United States v. Rahman, 189 F.3d 88 (2d Cir. 1999)……………………………69

United States v. Rios, 856 F.2d 493 (2d Cir. 1988)……………………………51

United States v. Robertson, 2015 U.S. Dist. LEXIS 82693 (M.D. Fla. 2015)……75

United States v. Rodriguez, 392 F.3d 539 (2d Cir. 2004)…………………………50

United States v. Romm, 455 F.3 990 (9th Cir. 2006)……………………………...76

United States v. Salameh, 152 F.3d 88 (2d Cir. 1998)……………………50-51, 85

United States v. Samaria, 239 F.3d 228 (2d Cir. 2001)………………………..49-51

United States v. Stewart, 485 F.3d 666 (2d. Cir. 2007)…………………………...50

United States v. Stewart, 590 F.3d 93 (2d Cir. 2009)…………………………..88

United States v. Truman, 688 F.3d 129 (2d Cir. 2012)…………………………47

United States v. Ullah, 2020 U.S. Dist. LEXIS 245691 (N.Y.S.D. 2020)………...77

United States v. Wallace, 85 F.3d 1063 (2d. Cir. 1996)…………………………...50

United States v. Williams, 2024 U.S. App. LEXIS 2115 (2d Cir. 2024)………….57

Yannai v. United States, 346 F.Supp. 3d 336 (N.Y.E.D. 2018)…………………...47

Statutes & Regulations:

2018 USSC Guidelines………………………………………………………....38

18 USC Sec. 2339(B)…….…………………………………………….. 39, 53, 65, 81

18 USC Sec. 3231……………………………………………………………....13

28 USC Sec. 1291……………………………………………………………....13

USG Sec. 2M5.3(a)…………………………………………………………………………38

USSG Sec. 2M5.3(b)(1)(E)…………………………………………………………………38

18 USC Sec. 2332b(g)(5)……………………………………………………………………39

USSG Sec. 5A………………………………………………………………………………41

18 USC 3553(a)……………………………………………………………………………...42

<u>Reference Materials</u>

Dictionary.com………………………………………………………………………………60

## JURISDICTIONAL STATEMENT

This appeal is from a final judgment of the United States District Court for the Eastern District of New York, which had jursidiction pursuant to 18 USC Sec. 3231. Judgment against Defendant-Appellant was entered on September 24, 2019. Notice of Appeal was timely filed on June 16, 2022. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. Sec. 1291.

## ISSUES PRESENTED

1. Whether Kasimov was deprived of his fundamental right to testify at trial?

2. Whether the evidence presented was sufficient to establish beyond a reasonable doubt the requisite knowledge required to prove Kasimov conspired and attempted to provide material support to a foreign terrorist organization, to wit, the Islamic State of Iraq and the Levant?

3. Whether the evidence presented was sufficient to establish beyond a reasonable doubt that Kasimov knew that the Islamic State of Iraq and the Levant was a designated foreign terrorist organization, engaged in terrorism, or engaged in terrorist activity?

4. Whether the district court wrongly denied a First Amendment jury instruction?

5.      Whether the district court wrongly applied the "terrorism enhancement" at sentencing?

## SUMMARY OF THE ARGUMENT

Kasimov faced strong disagreements with his trial counsel over trial strategy and ultimately the decision to testify, where trial counsel refused to ask certain questions of the government's primary witness and discouraged him from testifying for strategic reasons. The Court made a number of inappropriate statements to Kasimov about his relationship with his trial counsel that reasonably implied that he would be penalized for not deferring to his trial counsel, and which ultimately contributed to Kasimov's decision not to take the stand. Because this deprived Kasimov of his fundamental right to testify, his convictions must be reversed.

Kasimov stands convicted of serious terrorism offenses, namely attempting to and conspiring to provide material support to the ISIS foreign terrorist organization ("FTO"). The statute and the indictment required that he know that his alleged material support was directed to ISIS specifically. Evidence put forward at trial, viewed in its entirety from the perspective of a rational fact-finder, was insufficient to establish this requisite knowledge. Kasimov's predicament is the end result of an investigation that went far beyond its original targets, co-defendants of

Kasimov's who were involved in online extremist activities. While covert informants were able to dupe Kasimov' co-defendants into what they thought was an effort to send Akhror Saidakhmetov to Syria to fight for ISIS, Kasimov's limited involvement did not come with sufficient evidence that he knew the ultimate recipient of the alleged material support was ISIS. Where the evidence failed to establish so beyond a reasonable doubt, Kasimov's convictions must be reversed.

Separately, no evidence was ever presented to indicate that Mr. Kasimov knew that ISIS was a designated foreign terrorist organization, or involved in terrorism or terrorist activity. This knowledge was also required to establish scienter under the statute. The insufficiency of the evidence as to this element also requires Mr. Kasimov's convictions to be reversed.

During jury selection, Kasimov's trial counsel requested a clear jury charge indicating that Kasimov could not be convicted solely for his First Amendment-protected speech and, insofar as any opinions he had expressed were used against him, that they must be used only for legitimate purposes. The district court denied this request. This prejudiced Kasimov and the error was not harmless. Kasimov's conviction must be overturned as a result.

Finally, Kasimov was sentenced pursuant to a United States Sentencing Commission (USSC) Guidelines adjusted offense level calculation of 40, largely

due to the incorrect application of the draconian "terrorism enhancement" guideline adjustment. Kasimov was sentenced to the statutory maximum sentence of 180 months imprisonment on each count, albeit to run concurrently. Had the district court properly refused to apply the enhancement, Kasimov would have had a significantly lower adjusted offense level and would be entitled to a sentence of time served. Therefore, even if the Court refuses to overturn his convictions, Kasimov's sentence should be reduced to time served.

## STATEMENT OF FACTS

### I) Background to the Investigation

1. As early as summer of 2014, the FBI was investigating Kasimov's co-defendants, Akhror Saidakhmetov and Ahmed Juraboev. Trial Transcript (herein "Tr.") at 114, 129-130 (A-44, A59-60).

2. In August of 2014, Juraboev posted violent statements and a pledge of allegiance to the ISIS terrorist organization on an Uzbek-language website.

3. At roughly the same time, Saidakhmetov made comments reacting favorably to various ISIS propaganda videos. Id.

4. Juraboev and Saidakhmetov were roommates. Tr. 129. Saidakhmetov was one of several business associates of Abhror Habibov. Tr. 264. By roughly September of 2014, an FBI confidential human source ("CHS") was

involved in the investigation, directed to meet Saidakhmetov, and ultimately moved into an apartment with him. Tr. 118-119 (A-48-49).

5.    The CHS assisted Saidakhmetov to get travel documents, pay for rent, and help him arrange a flight to Turkey, apparently with the intention of crossing into Syria to join the ISIS terrorist group. Tr. 129-133, 264-268 (A59-63, A-105-109).

6.    This plot and Kasimov's alleged participation in it are the basis of his prosecution.

## II) The Armed Conflict in Syria and the Rise of ISIS

7.    "[B]y the spring of 2011 there was uprising against the Syrian regime, initially peaceful, but quickly escalated to a violent confrontation between the Syrian regime and a variety of armed groups of a different nature." Tr. 227 (A-101).

8.    "As the conflict progressed, groups like ISIS and a few others that are of terrorist nature and adopt a certain radical ideology, became a most powerful regime and fighting against each other." Id. (emphasis added).

9.    It is "fair to say" that "[t]he violence of the Syrian regime against the civilians…was absolutely appalling" and "[a]ll sides committed atrocities." Tr. 227-228 (A-101-102).

10. ISIS itself is a designated FTO that began in 1999. Tr. 149-150 (A-64-65).

11. The federal government designated ISIS and identified it by several different names in its multitude of designations and updated designations in the Federal Register as a foreign terrorist organization. Tr. 155 (A-70).

12. In 2014, ISIS dramatically expanded its territorial control. Tr. 159 (A-74).

13. In June of that year, ISIS declared the caliphate and declared itself a state. Tr. 159. The caliphate is the "authority that unites both political and religious authority for Muslims. It's a historical entity which had always existed in the Muslim world, but it had not in [sic] existed for the last century, and ISIS basically claimed or recreated that entity and it declared its leader as a new caliph. So somebody that, in theory if recognized, is the sole authority for Muslims worldwide." Tr. 159-160 (A-74-75).

14. The territory controlled by ISIS at this time included much of Syria, including "large parts of eastern Syria" and "[l]arge parts of western Iraq too". Tr. 183; see also GX 39. (A-76; A-81). "So basically the border between Syria and Iraq [in some parts] no longer existed as neither the Iraqi nor the Syrian government controlled and ISIS had conquered this land mass." Id.

15. ISIS did not have a presence in Gaza or Palestine. Tr. 226-227 (A-100-101).

16.	There is "animosity" between ISIS and Saudi Arabia, which have "a hostile relationship" between them. Tr. 544 (A-211).

17.	ISIS recruited foreign fighters from countries other than Syria or Iraq. Tr. 198 (A-92).

18.	These individuals often traveled to Syria from Turkey and concealed their travel to avoid detection by authorities. Tr. 200. (A-94). These individuals would often use coded language for the same reason. Tr. 205 (A-99).

19.	It was preferable for individuals who sought to join ISIS to be "vouched for" because ISIS was weary of law enforcement efforts to infiltrate their organization. Id.

20.	Nonetheless, there were legitimate reasons that a person would travel during this period to Turkey without any intention of joining ISIS, including social or educational reasons, research purposes and religious education. Tr. 226 (A-100).

21.	Similarly, there were legitimate reasons to travel to Syria, including humanitarian reasons, such as providing food, clothing, medical clinics, housing, and schooling to those suffering as a result of the armed conflict. Tr. 229-230 (A-103-104).

22.	Less than 1% of Muslims support ISIS. Tr. 224.

23. Many of the Islamic terms used by ISIS have benign significance and are used commonly by Muslims without affiliation with ISIS, including the terms "inshallah," "jihad," fard ayn," and "Allahu Akbar". <u>See</u> Tr. 122, 153, 190-91, 553. (A-52, A-68, A-84-85, A-220).

24. ISIS regarded all those who were not ISIS to be "kafir," or infidels, which carries intensely derogatory connotations to ISIS. Tr. 189 (A-83).

25. ISIS' conquests were major international news, and covered extensively by all mainstream media. Tr. 185, 194 (A-84, A-88).

26. ISIS recorded attacks and executions by video and disseminated them online, at which point they would often be picked up by mainstream media outlets throughout the world which would further disseminate them. Tr. 196 (A-90).

27. These videos served multiple purposes aimed at various audiences, including to project strength to supporters and to terrorize potential enemies. Tr. 197 (A-91).

28. ISIS propaganda videos are sent out by various distributors on behalf of ISIS, and then redistributed by others, such that recipients of these videos do not need to be in touch with ISIS. Tr. 552 (A-219).

29.    Recruiters might send these videos out to others to entice them to join ISIS. Tr. 553 (A-220).

30.    Receipt or viewing of ISIS videos does not, in and of itself, signify support for their content. Tr. 552-553 (A-219-220).

### III) Habibov and the Tea Party

31.    Habibov testified that after hiring Saidakhmetov, the two began to interact a few times a week. Tr. 266. (A-107).

32.    Saidakhmetov confided in Habibov that he was saving money to go to Syria to fight for ISIS and that a "caliphate" must be supported uncritically; ISIS was the only organization that had made such a declaration. Id.

33.    Habibov shared Saidakhmetov's support for ISIS. Tr. 267 (A-108).

34.    In late January of 2015, Habibov decided to help raise funds for Saidakhmetov's travel so he would "not be dependent on anybody else but himself." Tr. 269-270 (A-110-111).

35.    Though Saidakhmetov confided that he was going to fight for ISIS, the two discussed Saidakhmetov going first to stay at the Imam Al Bukhari Mosque and School for some time, before eventually making his way to Syria. Tr. 347. (A-156). No indication was provided that this mosque or school had any affiliation with ISIS.

36. Even after enough money had been raised for Saidakhmetov's flight, Habibov continued seeking funds to ensure that Saidakhmetov would not be an "asking hand" upon arriving at his destination. Tr. 308 (A-138).

37. Habibov turned to a group of which he was a member for assistance, known as the Tea Party, which raised funds to help armed fighters in Syria. Tr. 270 (A-111).

38. Habibov indicated that he would introduce Saidakhmetov to potential funders in person or by phone by telling them about his plans and asking them to provide money to him directly. Tr. 290 (A-133).

39. Asking Azizjon Rakhmatov for funds, Habibov referred to a weapon he wanted to help Saidakhmetov buy as a "toy" and separately as a "pencil". Tr. 305, 318 (A-134, A-150).

40. Habibov's personal knowledge of the group included that it had at least twenty members, that it had sent at least four people to Syria to fight, and the identity of its leader. Tr. 271, 284 (A-112, A-127).

41. Habibov's role in the group included reminding members to pay their dues on time. Tr. 270 (A-111).

42. The group's members spoke openly about supporting ISIS in person, using various terms of the group, including "brothers". Tr. 271 (A-112).

43. Nonetheless, Habibov also testified that the Tea Party provided legitimate humanitarian aid to Syrian orphans and widows and that not all of its donors knew that funds raised by the group were intended to support ISIS. Tr. 406. (A-166).

## IV) Dilkhayot Kasimov

44. Dilkhayot Kasimov is an Uzbek immigrant who was involved in the buying and selling of electronics in the U.S. and Uzbekistan. Tr. 277 (A-118).

45. Kasimov met Habibov in 2013 while they were both waiting in line to buy phones in Delaware. Tr. 276-277 (A-117-118).

46. Kasimov lived in Philadelphia at this time. Tr. 277 (A-118). Kasimov moved to an apartment in Brooklyn after Habibov helped him relocate and offered him an apartment which was held under the name of Habibov's business partner and another co-defendant, Akmal Zakirov. Id.

47. Kasimov and Habibov became legitimate business partners. Tr. 277-278 (A-118-119); see e.g. Tr. 282 (A-125) (discussing normal business issues via text message).

## IV.A) Kasimov's Relationships with Habibov and Others

48. Pursuant to a cooperation agreement, Habibov testified against Kasimov during his trial; Habibov was the only witness with any personal relationship

or personal knowledge about Kasimov. Habibov specifically testified as to his relationship with Kasimov, Kasimov's political views and relationships with others in their shared immigrant community.

49. In January of 2015, Habibov asked Mr. Kasimov about connections in Turkey for the purposes of printing and selling educational materials. GX 57 at 37-38 (A-122-123).

50. Habibov indicated that he had begun speaking very often with Kasimov by December 2015 – nearly a year <u>after</u> Kasimov's arrest and more than two years after meeting. Tr. 286 (A-129). As a result, it is difficult to pinpoint the exact date of all the comments Habibov attributed to Kasimov.

51. Habibov indicated that he once met with Kasimov at Kasimov's apartment, where Kasimov was watching a video by an imam who lived in the United States and criticized ISIS' ideology and what "what [ISIS was] doing in Syria". Tr. 287 (A-130).

52. Habibov indicated that Habibov was "disappointed" with the imam "just because he was living in the United States making such a statement". He also indicated that he "disagreed" with the imam, without explaining his disagreement further. <u>Id</u>.

53. When asked of Kasimov agreed or disagreed with the imam's criticisms, the substance of which were not explained, Habibov indicated that Kasimov "did not show any agreeing with the imam". Tr. 288 (A-131).

54. During the same visit, Kasimov purportedly explained to Habibov that Kasimov's former roommate, Mirsad[1], who lived with him in the same Bay Parkway apartment that Habibov had procured for Kasimov, had previously left to fight in Syria after Habibov brought up ISIS. Id. No indication was given as to whether or not Kasimov approved, and Habibov testified that he did not know if Kasimov had provided any assistance. Tr. 276 (A-117).

55. Habibov testified that by February 2015, or the month of arrest, he had discussed with Kasimov at least one other individual who had had gone to Syria and been killed while fighting for ISIS. Tr. 288-289 (A-131-132). Again, no indication was given by Habibov as to whether he told Kasimov that he had funded or agreed with these individuals' decisions, much less if Kasimov knew any of them, agreed with their decision, or supported it in any way.

56. Referring to a conversation that Kasimov had with Mahliyo, a romantic interest, and then shared with Habibov, Habibov testified that between living

_____

[1]Mirsad's name is variously spelled "Mirsad" or "Mirsod" throughout the trial transcript and exhibits.

in Saudi Arabia as Mahliyo suggested and living under ISIS rule in Syria, Kasimov allegedly would not mind either, but it would be "preferable" to live under ISIS rule in Syria "which is everything you could practice Islamic" [sic]. Tr. 286 (A-129).

57.    A text message conversation between Kasimov and Mahliyo discussing the same subject matter was introduced into the record at trial. In that text message exchange, Kasimov indicates that "pious ones are going to Gaza, Syria, or at least Iraq" instead of going to Saudi Arabia, and that education should not be prioritized over the "fard ayn" [individual duty] of "jihad" [struggle]. Tr. 517 (A-191). Unlike Habibov's summary of this disagreement, this exchange does not mention ISIS at all.

58.    Habibov also testified that Kozim Gafurov[2] was the leader of the Tea Party and was Habibov's roommate. Tr. 284 (A-127).

59.    Habibov indicated that he believed Kasimov was friends with Gafurov and Kasimov was present during visits to "his" apartment, without clarifying whether it was Kasimov's apartment, Gafurov's apartment, or someone else's. Tr. 285 (A-128).

---

[2]Gafurov's first name is variously spelled "Kosim" or "Kozim" throughout the trial transcript.

60. The contents of any discussion or interaction at the apartment were never introduced.

61. Nonetheless, in text messages between Kasimov and Habibov, Kasimov indicates his disagreement with Gafurov's religious and political views. Specifically, Kasimov writes, "Kozim said that exchanging sms breaks Sharia rules and the people say it's nonsense." Tr. 284 (A-127). Notably, this comment was sent via text message and referred to text messages with women, such as those Kasimov shared with Mahliyo. <u>Id</u>.

**IV.B) Kasimov's Alleged Involvement in the Plot to Send Saidakhmetov to Fight for ISIS**

62. Habibov testified that he had "no knowledge" that Kasimov was a member of the Tea Party. Tr. 276 (A-117).

63. Habibov further indicated that he did not know whether Kasimov had given money previously to help any individual who was fighting in Syria, such as the various individuals the two had allegedly discussed. <u>Id</u>.

64. Habibov did not testify to having ever admitted his own support for ISIS to Kasimov; his vague disagreement with a critic of ISIS "just because he lived in the United States" is the only ISIS-related opinion he testified to relaying to Kasimov.

65. Habibov nonetheless testified that he had "several conversations with...Kasimov, and [Habibov] came to the conclusion that he would, if [Habibov] ask[ed], he doesn't mind to support Saidakhmetov's plan". Id.

66. Crucially, Habibov admitted that he told Kasimov that Saidakhmetov was going to Syria "to fight," but could "not remember" if he told him that Saidakhmetov was going to fight "for ISIS". Tr. 286 (A-129) (emphasis added).

67. The week before Saidakhmetov was to leave, Kasimov texted Habibov indicating his willingness to send money to support "the brother that is leaving". Tr. 306; GX 165 (A-135-136).

68. Separately, Habibov received a message from Juraboev indicating that the group's ISIS contacts in Syria would not receive Saidakhmetov. Tr. 465.

69. Habibov called Kasimov, and asked if anyone else was present, to which Kasimov indicated he had dropped off a taxi client and was alone. Tr. 314-316, GX 108 (A-144-148).

70. Habibov then told Kasimov, "That little brother is leaving. Apparently he doesn't have anyone who would receive him or any other connections. Is there any way to find links to bigger ones here and there? Actually, although

he is going with a smarter brother. They both don't know anyone. They are leaving in a hurry." Id.

71.   Kasimov replied with an audible noise, transcribed as "Hmm". Id.

72.   Habibov continued by asking about Mirsad, to which Kasimov responded, "Who?". Id.

73.   Habibov then asked about a "Brother Ikrom," to which Kasimov responded "Who was brother Ikrom?". Id.

74.   Habibov then asked about "some brother" who goes to Al Iman [mosque] to whom Kasimov had dropped off money, and asks his name. Kasimov asked, "Brother Otabek?" Id.

75.   Habibov indicated that Brother Otabek is "very close to brother Ikrom" and asked if Otabek "has connections". Id.

76.   Kasimov responded "I don't know. OK?" Habibov replies, "So I guess you don't know brother Ikrom". Id.

77.   Kasimov responds, "we'll take care of it, we will talk about brother. I got clients" before the two end the conversation. Id.

78.   As Saidakhmetov's flight approached on February 24, Habibov called Kasimov again to ask for more money for food and "that thing," which

Habibov indicated at trial to mean a weapon. Tr. 342-343, GX 119 (A-151-152, A-178).

79. Kasimov, working as a taxi driver, variously offered to drop off money to another individual to be picked up by Saidakhmetov, to have Saidakhmetov meet with him, or assist in driving Saidakhmetov to the airport before settling on meeting him and the CHS in person to drop off money. Tr. 346-353 (A-155-162).

80. Kasimov had never met Saidakhmetov until this point. Tr. 353 (A-162).

81. Habibov provided both Kasimov and Saidakhmetov with each other's phone numbers and arranged for Kasimov to meet Saidakhmetov in the airport to drop off the money. Tr. 353-354 (A-161-162).

82. Almost simultaneously, Habibov told Saidakhmetov via phone not to tell anyone else what he was doing: "Don't tell anyone about this business between you and me." Tr. 354, GX 118T (A-162-164).

83. Kasimov met Saidakhmetov and the CHS at the airport as they prepared to depart and dropped off the money. Tr. 497-498; GX 122T & 123T (A-180-184).

84. The CHS asked Kasimov if he would be joining the pair in Istanbul, Turkey, to which Kasimov responded "Inshallah" or "God willing". Tr. 502-503 (A-188-189).

85. Subsequent to Habibov's testimony, the Government introduced three ISIS propaganda videos and screenshots from them, extracted from Kasimov's phone. Tr. 532-537, GX 40, GX 41B, GX 211-215; Tr. 547 (A-194-202, 206-207, 214).

86. The first video consists solely of a prayer taken from the Qu'ran with English subtitles, recited by a "Commander Abu Usamah Al-Maghribi," dressed in military fatigues and surrounded by similarly dressed armed men. The Qu'ran passage, translated into English, calls on Muslims to reject worldly values in favor the afterlife, or to face divine punishment.

87. The second video is a montage of images of various individuals, including the individual in the first video, in military clothing engaged in a variety of activities but with audio replaced by an Arabic-language chant. The activities pictured include individuals in military fatigues making speeches, standing with military equipment, using rifles, referencing strategic maps, and marching in military gear.

88. The third video is an Arabic-language statement by an unknown individual, followed by footage of a targeted explosion, and then a further montage similar to the second video.

89. None of the videos contained any explicit indication in English or Uzbek that the individuals or events in them are related to ISIS.

90. A government expert witness and Arabic translator with many years of counterterrorism experience who has translated ISIS "documents, video, chats, like, small clips identifying the nature of their propaganda and the nature of their actions" testified that the flag present in each of the videos is an ISIS flag. Tr. 530-531, 536 (A-192-193, 201).

91. The translator further testified that the song in the second video called, in Arabic, on listeners to join the caliphate, that the third video included the terms "jihad," "kufar," and "Allahu Akbar" ["God is Great"], and that the man in the third video was encouraging "mujahideens" to stick to the Qu'ran and engage in "martyrdom attacks". Tr. 537-539 (A-202-204).

92. Arabic and Uzbek are completely different languages, and knowledge of one does not indicate knowledge of the other. Tr. 541 (A-208).

93. The government's other expert witness identified the commander in the first video to be an ISIS commander, identified the videos to contain ISIS flags,

and indicated that the watermark on the third video was associated with Al-Furqan Establishment for Media Production, a media production company for ISIS. Tr. 545-547 (A-212-214).

94. None of the videos contain explicit English-language or Uzbek-language indicators that the videos are affiliated with ISIS.

95. No evidence was put forward indicating how or why they were on Kasimov's phone, or whether he had watched them, approved of them, distributed them to others, or was aware of their presence.

96. ISIS videos are "sent out by various distributors on behalf of ISIS" and then further disseminated, and as such, a person can receive ISIS videos without having any direct relationship with ISIS. Tr. 552.

97. Watching ISIS videos does not indicate that the viewer subscribes to what is in them. Tr. 552-553 (A-219-220).

98. During summation, the government summarized the following as proof beyond a reasonable doubt to establish his requisite knowledge and intent:

a. that Kasimov allegedly knew all about ISIS and "wanted to live in the caliphate," and considered it "preferable" to live under ISIS-controlled territory, that he considered jihad to be fard ayn, that he referenced "pious" people going to multiple places including Syria, and that his opposition to

Saudi Arabia aligns with ISIS' opposition; Tr. 608, 617-619 (A-228, 237-239).

b.     that Habibov told Kasimov that Saidakhmetov "was going to Syria to fight for ISIS" [sic] Id.;

c.     that Kasimov had ISIS propaganda videos on his phone, Id.;

d.     that Kasimov understood "the same codes and coded phrases as the other members of the conspiracy...bus ticket, going there, pencil. He understood them." Id.; see also Tr. 613, 619-622 (A-233, 239-242).

e.     similarly, that Kasimov did not question what sort of "connections" Habibov sought during a phone call seeking out ISIS connections, Tr. 630 (A-250).

f.     that Kasimov "knew about people who were fighting for ISIS in Syria," including his Bay Parkway roommate, Tr. 617-618, 623 (A-237-238, 243), and that he was roommates with co-defendant Zakirov and friends with Habibov, and therefore was not "randomly selected" to contribute to Saidakhmetov's travel, Tr. 623 (A-243).

g.     and finally that Kasimov was eager to offer his own money and to provide a ride and meet Saidakhmetov despite never having met him before, Tr. 628 (A-248).

**V) Ex Parte Discussions Involving Kasimov's Conflict With Trial Counsel and Desire to Testify**

99.    Before trial had begun, Kasimov expressed "irreconcilable differences" with his attorneys had previously requested the court replace them on the eve of trial. See Transcript of Proceedings of Status Conference on Sept. 11, 2019 at 9 (A-43).

100.   But as trial proceeded, Kasimov was experiencing increasing difficulties in his relationship with his attorney, primarily over trial strategy in addressing statements that Kasimov contended to be flagrant lies. In the midst of Habibov's testimony, Kasimov sought to have his attorneys cross-examine Habibov with specific questions based on Kasimov's personal knowledge. Tr. 423, 430 (A-167, 174).

101.   Trial counsel refused, arguing that to do so would open the door to harmful evidence. Id.

102.   Although this was a delicate and sensitive matter between Kasimov and his trial counsel, the district court, during an ex parte hearing, responded with a series of inappropriate and intimidating comments, reproduced here in full:

> THE COURT: You don't have to answer this question, sir. I mean, we are doing this ex parte on the record. You have heard me say repeatedly that you have two of the best lawyers in the country. I amend that statement because I hadn't seen the gentlemen's work before personally. You

have three of the best lawyers in the country. I will tell you this, as a lawyer who practiced law for 33 years before going on the bench. In fact, my first day at work as a junior associate was on September 18 of 1978. So it was exactly 41 years ago the other day. When I started practicing law, despite having a big presence, four degrees from Harvard, born in Bed-Stuy, raised in Harlem, educated by the Jesuits, and a lot of swagger about my legal abilities, the first time I took a deposition in a civil case, I couldn't get the witness sworn because I refused to agree on what the normal agreements for a deposition were. In other words, I was as green a rookie as you could have. The first time I went to state court, I was all set to hand in some papers on a civil motion; and the mid-level associate, who was assigned to teach me a few tricks, said that's great. By the way, did you serve the papers on the other side? I said, Sure, I did, by mail. He said, That's funny. I don't see an affidavit of service by mail. I said, Do I need that? He said, Well, the clerk is not going to take your papers, kid, without proof of service; and my face fell. He said, Okay. Just this once. And he went over to the lawyer on the other side -- it was a civil case -- and he said, Okay. We have a rookie here. We are handing you a second set of papers, which he happened to have in his briefcase. And he initialed the set of papers, and I was able to get the papers in. In other words, at the ripe old age of 28, admitted to the bar, four degrees from Harvard, I didn't know anything about the practice of law; and I was admitted to the bar. Okay. I understand you want these lawyers to ask your questions. I will just say this to you. These lawyers have gotten some defendants out of some amazingly tight spots. Okay? I'm not going to go into any specifics except to say there was a movie made that virtually everybody in America saw about one of your lawyer's clients. I'm not going to say which one. I will just say, you know, her name rhymes with Macedonian and the movie rhymes with Goodfellas; and she got him off. And I'm not going to say anything about

someone whose name is Sharkey, although some nicknames just start with the shark part, who had a guy who was convicted many times of having murdered two policemen; and in this judicial district juries don't like the death penalty. Somebody who we will just call her Sharkey was so good that twice -- not once, twice -- she convinced the Second Circuit Court of Appeals to take the guy off death row, who had murdered two policemen. I have often said, I hope I never do anything wrong; but I have often said, if I do, I know two ladies I'm going to be calling to be my lawyers. They probably won't do it, okay, but I know two ladies, and they are on either side of you. And, by the way, the dude sitting to your right, he is not exactly chop liver. Okay. He is a hell of a lot better than I was my first time out practicing law and probably after I had been out ten years or so. He is real good. Your team is real good. So this is all I will say to you, I have a huge ego, as you may have gathered. Okay. And you don't know the half of it. All right. I know my limits. I know my limits. I would not disagree with a line of questions that your three lawyers have said don't do it, anymore than I would put on a white hood and a white sheet and stroll into a Klu Klux Klan meeting and take it off and say, surprise. Okay? That would not go well for me. I get that. And I understand, I ought to be able to wear what I want to wear to a costume party; but that's just not cool. So all I'm saying to you, sir, is this. **As the client you have the right to say I think you should ask X. But I will tell you one other story, and then I will let you talk with your lawyers and rethink your issue. There is a story told about a gentleman named Robespierre in the French Revolution. You know about the French Revolution, right?**

THE DEFENDANT: Yes.

THE COURT: And in the French Revolution -- very, very bloody revolution -- **the guillotine was used to cut people's heads off. That's how they executed people who were found to be with the old king.** And so there is

a story told about Robespierre, who was one of the leaders of the French Revolution and Madame Lafarge, who was one of the leaders of the French Revolution, and they bring out Marie Antoinette's sister. Marie Antoinette was one of the people from the Ancien Regime, and Marie Antoinette was considered someone that revolutionaries hated. Her sister was someone they hated. **So they said we are going to execute. They had a trial. They are going to execute. So they put her head in the guillotine and the guillotine starts to come down and stops, and the crowd gasps. That's Macedonio, okay.** They are shocked. And they said, well, it's a miracle; and they let Marie Antoinette's sister go. And then they bring out this priest who was terrible to the peasants, and they put his head in the guillotine, and it starts to come down; and it stops, and the crowd gasps again. This is another miracle. Robespierre is upset. Lafarge is upset, but what are you going to do. **And then, finally, they bring out an arrogant client, and he puts his head in the guillotine and he turns to the executioner and he says, yeah, okay, but it's never going to work right as long as you guys don't take that nail away. Okay? I don't know what it is you are telling your lawyers to ask, but it's the equivalent of saying take that nail away.** Now, I don't know what happened, but I don't think it was good for the guy who said take the nail away, as opposed to the guy who said, it's a miracle and walk out of here. Goodfellas and Ronell Wilson. **You are surround by tigers of the bar; and, if I were you and I was sitting there, there is no way on God's green Earth, Inshallah, Inshallah, that I would ever think of telling these lawyers what to do, let alone saying, oh, no, no, no, you are wrong, pull the nail out.** Okay. I don't know what that jury is going to do. I have seen these lawyers work. I'm telling you, I'm telling you, they are the best. With all due respect, I don't know how bright you are or how bright you think you are; but I know how bright I thought I was when I graduated from Harvard Law School with

my four degrees and my Jesuit education, and I couldn't even get papers filed in a civil case. This is a criminal case, this is a serious case; and you've got three of the best lawyers surrounding you. Think about it, dude. Think about it. I understand. I understand you can tell them, pull that nail out, pull that nail out; but I'm telling you, I'm telling you. All right? Now I'm going to go back and in my part of the chambers. You can have a conversation in private with your lawyers.

Tr. 425-430 (A-169-174) (emphasis added).

103. Following the district court's discussion of his own inadequacies as a young lawyer, his praise of court-appointed counsel, and his discussion of executions following his praise of trial counsel's success in a capital case, Kasimov immediately dropped any desire to continue discussing strategy with his attorneys: "No. I already decided….I understand. I take your advice...No, no. I take your advice. I agree with you. I have the best lawyers, I agree with that. So yeah, I take that." Tr. 430, 431 (A-174, 175).

104. Kasimov's continued conflict with his attorneys did not end there. During a subsequent ex parte hearing, trial counsel indicated to the Court that they did not want an emotional Kasimov to testify at the close of the prosecution's case. Tr. 561 (A-221).

105. Addressing Kasimov, the Court stated:

> THE COURT: As you well know, Kasimov, it is your call as to whether you testify or not. You are the client. It is

your decision. You have the right not to testify or the right to testify and I will advise you again even further with respect to that right on the record now just so you have this in mind. You have the right to testify on your own behalf, sir, if you wish to do so. On the other hand, you may not be forced to be a witness at your trial. This is because under the constitution and the laws of the United States no person can be compelled to be a witness in his own case. You are not required to testify. There is never a requirement and never an expectation implicit or implicit that you as a defendant will take the stand and testify. You never ever have to do so. It is the Government's burden to prove that you are, in fact, guilty beyond a reasonable doubt and that burden remains solely with the Government throughout the entire trial. You do not have to prove you are innocent. You do not have to prove anything at all. You certainly do not have to testify and the jury may not attach any significance to the fact that you did not testify if you elect not to testify. And I will instruct them with respect to that, as I have throughout. The jury may not draw an adverse inference against you if you elect not to testify. The jury may not consider it in any way, shape, or form in their deliberations in the jury room. And that is consistent with modern federal jury instructions and criminal instruction 5-2.1*. **As I'm sure as your distinguished counsel will tell you**, that has long been the law of the United States and that has long been the practice in this courthouse and in this court. So, in all candor, you may or may not be feeling better or worse or the same on Monday. You had a week of trial now and the decision to testify or not to testify is one that I think you ought to be at this point in a position to make. It is your call. **You have had plenty of time to talk with your counsel about it**. And it seems to me that we have a jury here. They're going to come back next week for sure because we have agreed that we would have closing arguments and we would have our charge conference on Monday. So it is not as if they are not coming back and it

is not as if they haven't planned on coming back because this is a two-week trial, as you know. That being said, I'm interested in hearing what the defense's position is with respect to how we ought to proceed.

MS. MACEDONIO: Your Honor, it would be the defense application that we adjourn now until Monday and at that time Kasimov will either testify or not.

THE COURT: All right. Is that acceptable to you sir?

THE DEFENDANT: Yes. Sir."

Tr. 562-564 (emphasis added) (A-222-224).

106. That Monday, Kasimov did not testify and the defense rested. Tr. 577 (A-225).

## VI) First Amendment Jury Charge Instruction Denied

107. During the charge conference, trial counsel requested a jury charge in discussing the elements of the conspiracy offense that "Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." Tr. 591.

108. Trial counsel specifically requested this instruction because "the type of evidence we've had in this case of videos, transcript calls, including intermingling of religion, it is important to emphasize with a charge like this that someone with this charge has First Amendment protections". Id.

109. The Government opposed the instruction, claiming it was unnecessary where none of Kasimov's alleged conduct was "solely First Amendment protected activity". Tr. 591-592.

110. The district court denied the proposed instruction. Id (A-226).

## VII) Conviction & Sentencing with "Terrorism Enhancement"

111. Kasimov was convicted on both counts. Tr. 781 (A-251).

112. Pursuant to the 2018 United States Sentencing Guidelines (USSG), the Court, the United States Probation Department (herein "Probation"), and all parties calculated that Kasimov's Base Offense Level for violating 18 U.S.C. Sec. 2339(B)(a)(1), pursuant to USSG Sec. 2M5.3(a), was 26. Sentencing. At 9 (A-253).

113. Probation and the Government calculated that a two-level increase was warranted where pursuant to USSG Sec. 2M5.3(b)(1)(E) because Kasimov's offense allegedly indicated "intent, knowledge or reason to believe" that the material support "would be used to commit or to assist in the commission of a violent act." Id.

114. Probation and the Government further argued that a twelve-level increase and a Criminal History Category (CHC) increase from I to VI pursuant to the draconian USSG Sec. 3A1.4 because the offense was intended to

promote a "federal crime of terrorism" under 18 USC Sec. 2332b(g)(5). Id. at 10 (A-254).

115. A federal crime of terrorism is one that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and violates one of many enumerated statutes, including 18 USC Sec. 2339(B).

116. Discussing conduct affecting government, the Government indicated "Thus, Kasimov's own conduct...was to provide a fighter to participate in ISIS's activities, necessarily including the formation of the Islamic State. At the time Kasimov contributed money and helped send a fighter to join ISIS, ISIS had seized significant territory from the Syrian and Iraq governments and was fighting to defend its territory not only from those governments but from the U.S. government as well." ECF Dkt. No. 513 at 9.

117. Based on this Adjusted Offense Level of 40 and CHC of VI, Probation concluded that Kasimov's convictions carried a guideline imprisonment range of 360 months to life; recognizing that the statutory maximum sentence at the time of the offense was 180 months on each count, Probation concluded that Kasimov should be sentenced to 360 months in prison, followed by ten years of supervised release. Id. at 14 (A-258).

118. The Government agreed with the Adjusted Offense Level calculation of 40 and requested a sentence of 240 months, followed by ten years of supervised release, acknowledging that Kasimov's role in the offenses was less culpable given that he was not a member of the Tea Party. Id. at 15; and ECF Dkt. No. 513 at 12.

119. While agreeing with the Base Offense Level calculation, Defense rejected the adjusted calculation of Probation and the Government, arguing that the evidence did not indicate that Kasimov had any reason to believe he knew the funds he contributed would be used to commit or assist in committing a violent act, and where the evidence did not show that Kasimov's alleged crimes had the specific intent of being "calculated" to affect or influence government conduct. ECF Dkt. No. 505 at 8-12.

120. Defense calculated that pursuant to USSG Sec. 3B1.2(a), a four-level mitigating role reduction was justified where Kasimov was "a minimal participant in any criminal activity". Id.

121. Because Kasimov has no criminal history, Defense argued that his proper CHC was Level I. Based on this, Defense concluded that the proper Adjusted Offense Level was 22, and that Kasimov's Guidelines-recommended sentencing range was 41-51 months. Id.

122. Accepting Defense's calculation but removing the minimal role reduction, Kasimov's Adjusted Offense Level would have been 26, and the Guidelines-recommended sentencing range would have been 63-78 months. USSG Sec. 5A.

123. Further accepting that two-level offense characteristics level increase was justified, his Adjusted Offense Level would have been 28, and the Guidelines-recommended sentence range would have been 78-97 months. <u>Id</u>.

124. The district court summed up the argument between Defense and the Government regarding the application of the terrorism enhancement. S. at 10-11 (A-254-255).

125. Summarizing the Government's position about the government influence prong, the district court indicated: "The Government also argues the defendant was aware that ISIS was a designated foreign terrorist organization engaged in violent terrorist activity, including attacks on Americans. The Government notes defendant possessed ISIS propaganda videos on his phone, at the time of his arrest, including videos depicting suicide bombings and explosions carried out by ISIS." <u>Id</u>.

126.   The district court gave no further analysis of its decision to agree with the Government and Probation Adjusted Offense Level assessment. <u>Id</u>. at 58 (A-260).

127.   Ultimately, after considering the applicable 18 USC 3553(a) factors, the Court imposed a sentence of 180 months on each count, to be served concurrently, followed by a period of supervised release. S. at 61-62 (A-263-264); ECF Dkt. No. 517.

128.   Kasimov has been in custody since arrest and has thus far served over 108 months imprisonment. S. at 53 (A-259).

## <u>ARGUMENT</u>

**I) Kasimov was deprived of his fundamental right to testify due to the district court's admonitions**.

1.     The right to testify at one's criminal trial is rooted in the Fifth and Sixth Amendments to the United States Constitution. <u>See</u> <u>Brown v. Artuz</u>, 1997 U.S. App. LEXIS 34018 (2d Cir. 1997) (citing <u>Rock v. Arkansas</u>, 483 U.S. 44 (1987) and <u>United States v. Bifield</u>, 702 F.2d 342, 349 (2d Cir. 1983)). This Court, like most other circuits, has ruled that this right is one of few "personal rights" that "belongs to a defendant and cannot be made for him by defense counsel." <u>Brown</u>, 1997 App. LEXIS 34018 at 16.

2.   Where a defendant's personal decision to testify is "overborne by his counsel," defendant's right to testify has been violated. <u>See</u> <u>Dean v. Clinton Correctional Facility</u>, 93 F.3d 58, 62 (2d Cir. 1996) (internal citations omitted).

3.   Notably, the <u>Brown</u> court refused to rule that a trial court is required to make an interjection through a direct colloquy advising a defendant of their right to testify – as happened here – because, even if "a trial judge is <u>permitted</u> to conduct such an inquiry even when exceptional circumstances are not present, such colloquy will <u>generally be inadvisable</u>, as judicial interference with counsel's strategic decision not to place [their] client on the stand 'poses a danger that the judge will appear to encourage the defendant to invoke or waive this right' even when it is unwise to do so." <u>Brown</u>, 1997 App. LEXIS 34018 at 29, note 2 (citing <u>e.g.</u> <u>United States v. Joelson</u>, 7 F.3d 174, 178 (9th Cir. 1993) (emphasis on "permitted" in original; emphasis on "generally be inadvisable" added).

4.   <u>Joelson</u>, 7 F.3d at 176, cited by the <u>Brown</u> court, is instructive. In that case, a district judge refused to allow a defendant to replace his attorney during trial; the attorney then requested an <u>ex parte</u> hearing, whereupon the defendant explained that he was dissatisfied because he wanted his attorney

to call several witnesses and because he wanted to testify, while his attorney disagreed for tactical reasons.

5.   Addressing the defendant directly, the trial judge stated,

> Well, now, Joelson, you, of course, have a right to take the stand and testify. But whether a defendant should take the stand and testify is a matter of some strategy, and your lawyer is certainly in a better position to advise you than you are to advise yourself on that subject. I would strongly suggest that whatever his advice is, if you want to testify and he says no, you should not. Or if it's the other way around even, you ought to follow his advice because for a defendant to take the stand and testify is to subject himself to cross examination. And perhaps if your lawyer has told you that his advice to you is to not take the stand, perhaps he feels and may have a good reason for feeling that you'd be slaughtered on cross examination and would do yourself no good at all. There's such a thing as crucifying yourself when you take the stand and testify. So once again, I can only say to you that your lawyer is an experienced lawyer and you ought to follow his advice.

Id. at 176-177.

6.   The Ninth Circuit described this exchange as "troubling," but found no error where, although the district court's advice was "inadvisable," it was not "so egregious that [the defendant's] ability to knowingly and intentionally waive his right to testify was impaired". Id.

7.   Defendant-Appellant submits that this case was so egregious. The multiple colloquys that the district court held with Kasimov and his trial counsel ex

parte to address the issues of trial strategy and the right to testify were not only inadvisable and troubling, but undermined Kasimov's right to testify far more aggressively than what was discussed in Joelson.

8.   Here, unlike in Joelson, the district court not only provided the defendant with advice to trust his attorney, but provided elaborate and extensive descriptions of his lawyer's alleged better judgment. The statements the district court made included references to trial counsel's successes in wholly different cases involving different charges, and emphasized that at least one of the cases was turned into a film.

9.   But most disturbingly, the district court's admonishment took a dark turn where the court began discussing executions during the French Revolution. A plain reading of the district court's comments implied that trial counsel was like the nail preventing the execution of those condemned by the revolutionaries – and opening one's mouth, i.e. testifying, would result in condemnation. Such rhetoric is alarming even when understood symbolically; but given the district court's own mention of trial counsel's successes in overturning death penalty verdicts, a reasonable defendant could have also taken the admonition literally.

10. The nature of this parable is also made all the more disturbing where, insofar as the analogy is concerned, it is the district court that ultimately decides sentencing – that is, the district court was the analogous executioner.

11. And while the district court held ex parte colloquys with Kasimov separately to discuss both trial strategy issues and the right to testify, the district court indicated to Kasimov that both were rights that belonged to him personally, blurring any distinction between rights held by him personally and decisions properly deferred to trial counsel.

12. Further, even when discussing the right to testify, the district court's encouragement that Kasimov consult with his dissenting counsel over the course of the weekend blurred the inappropriateness of the two colloquys.

13. A reasonable person standing in Kasimov's shoes would have concluded that, where disagreements surface between the defendant and trial counsel, the district court was not-so-subtly discouraging Defendant-Appellant from making his own decisions and exercising his own rights, including his right to testify, both due to undue pressure and the reasonable implication that to do so could result in a worse penalty.

14. Given that even subtle intervention by the district courts over such matters is inadvisable, Defendant-Appellant submits that the facts of this particular

case are so egregious that it would undercut any defendant's fundamental right to testify to ignore this error. As such, the Court should overturn Kasimov's conviction.

15. This error deprived Kasimov of a fundamental right to testify, and is therefore a "structural error" and not subject to harmless error analysis. Messina v. United States, 2020 U.S. Dist. LEXIS 128647, 65-68 (N.Y.E.D. 2020) (citing McCoy v. Louisiana, 138 S. Ct. 1500, 1511 (2018)); Yannai v. United States, 346 F.Supp. 3d 336 (N.Y.E.D. 2018).

16. This error is preserved even though Kasimov did not explicitly object during trial. See Chang v. United States, 250 F.3d 79 (2d Cir. 2001) (defendant does not waive right to challenge violation of the right to testify on appeal because defendant or trial counsel failed to object).

**II) Evidence of Kasimov's mental state was insufficient to establish that he held the requisite knowledge of supporting ISIS.**

**II.A) Preliminary Issues**

**II.A.1) Standard of Review and Statutory Framework**

17. On appeal, the sufficiency of evidence is reviewed de novo. United States v. Truman, 688 F.3d 129, 139 (2d Cir. 2012).

18. On review, the Court must view the evidence "in the light most favorable to the prosecution" and uphold the conviction "if any rational trier of fact could

47

have found the essential elements of the crime beyond a reasonable doubt." United States v. Capers, 20 F.4th 105, 113 (2d. Cir. 2021); Jackson v. Virginia, 443 U.S. 307, 319 (1979). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004) (internal citations omitted).

19.   The evidence must be considered "in its totality, not in isolation, and the government need not negate every theory of innocence." United States v. Autuori, 212 F.3d 105, 114 (2d. Cir. 2000).

20.   Nonetheless, "[a] criminal defendant who challenges the sufficiency of evidence shoulders a heavy burden, but not an impossible one." United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004). "[I]t would not satisfy the Constitution to have a jury determine that the defendant is probably guilty." United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (citing Sullivan v. Louisiana, 508 U.S. 275, 278 (1993)).

21.   Similarly, "specious inferences are not indulged." Jones, 393 F.3d at 111. The jury may not reach its verdict simply by stacking inferences upon inferences. United States v. Martinez, 937 F.2d 299, 304 (7th Cir. 1991).

22. If the evidence viewed in the light most favorable to the prosecution gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." Lorenzo at 159 (citing United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002)).

23. And "when a jury finds – based solely on inferences – that the government proved an element of a crime, a reviewing court must be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." United States v. Al Jabori, 90 F.3d 22, 26 (2d Cir. 1996); see also United States v. Samaria, 239 F.3d 228, 236 (2d Cir. 2001) (overruled on other grounds) ("Circumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime. Such indicia, often accompanied by more general evidence of association, come in a variety of forms.")

24. "[I]n order to prove conspiracy...the Government must show "more than evidence of a general cognizance of criminal activity, suspicious circumstances, or mere association with others engaged in criminal activity."

United States v. Ogando, 547 F.3d 102, 107 (2d Cir. 2008) (citing Samaria, 239 at 233).

25. To establish sufficiency for a conspiracy, the government must prove "specific intent to achieve the object of the conspiracy". United States v. Wallace, 85 F.3d 1063, 1068 (2d. Cir. 1996). "To establish a criminal conspiracy, the government must prove that the conduct agreed upon by the conspirators includes "all the elements of the substantive crime." United States v. Pinckney, 85 F.3d 4, 8, (2d Cir. 1996).

26. "Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence." United States v. Stewart, 485 F.3d 666, 671 (2d. Cir. 2007).

27. The government must prove that the defendant agreed "to commit a particular offense and not merely a vague agreement to do something wrong." United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998) (internal citations omitted).

28. Similarly, "[p]roof that the defendant knew that some crime would be committed is not enough". United States v. Friedman, 300 F.3d 111, 124 (2d Cir. 2002) (emphasis in original); see also, e.g., United States v. Rodriguez,

392 F.3d 539 (2d Cir. 2004) (evidence to sustain an allegation that defendant served conspirators as a lookout was insufficient to establish that he had specific intent to participate in a <u>drug</u> transaction, even though or if he owned the car in which the drugs were seized, sat in the car while drugs were present, brought weapons, and engaged in phone conversations with conspirators).

29. "[A] defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy." <u>Samaria</u>, 239 F.3d at 235. Similarly, "[m]ere association with conspirators and suspicious circumstances...are insufficient bases for a conspiracy conviction." <u>Salameh</u>, 152 F.3d at 151 (citing <u>United States v. Nusraty</u>, 867 F.2d 759, 763-765 (2d Cir. 1979) ("[M]ere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement"); <u>see also</u> <u>United States v. Rios</u>, 856 F.2d 493, 496 (2d Cir. 1988) (mere association does not establish participation in a conspiracy).

30. In a similar vein, conspirators' conscious choice to involve a person in criminal activity based on their personal relationships with the person may be probative of the conspirators' state of mind, but is not probative of that person's. <u>See</u>, <u>e.g.</u> <u>Ogando</u> at 108 (cab driver's familial ties to drug

trafficking conspirators and the conspirators' mention that he had been arrested during drug bust was probative of the conspirators' state of mind, but did not show cab driver knew the nature of the conspirators' business).

31. Particularly relevant to this case is United States v. Di Stefano, 555 F.2d 1094 (2d Cir. 1977). The Court overturned that defendant's convictions for conspiracy to rob a bank where no independent evidence existed to establish that the co-conspirators had shared enough information to indicate the defendant's knowing agreement to rob a bank. This was in spite of that defendant's indication by "nodding" that there was no guard at the bank prior to the robbery.

32. In particular, the Di Stefano co-conspirator's testimony, like Habibov's, was similarly uncertain: "I don't know exactly how we told her to do it. I don't remember. I'm trying to remember. I can't" Di Stefano, 555 F.2d at 1105, n. 4.

33. To prove the requisite mental state for an attempt crime, the government must establish beyond a reasonable doubt that a defendant "had the intent to commit the object crime…" United States v. Farhane, 634 F.3d 127, 145 (2d Cir. 2011).

34. In relevant part, 18 U.S.C. Sec. 2339(B)(a)(1) (emphasis added) states "Whoever <u>knowingly</u> provides material support or resources to a foreign terrorist organization, or attempts to do so" shall be subject to criminal penalties.

## II.A.2) Direct Evidence Failed to Prove or Contradicted Kasimov's Alleged Knowledge, and The Government's Case Was Entirely Circumstantial

35. The Government provided no direct evidence of Kasimov's alleged knowledge that Saidakhmetov was traveling to fight for ISIS. Instead, the Government depended entirely on circumstantial evidence. All direct evidence either failed to implicate Kasimov in the alleged plot or tended to cast doubt on any involvement. More specifically, and as discussed in greater detail _infra_:

a. No direct evidence indicated that Kasimov was aware that Saidakhmetov was fighting for ISIS, where Habibov was unable to remember if he told Kasimov that he was sending Saidakhmetov to fight for ISIS specifically and where direct evidence affirmatively indicated that Kasimov had no personal familiarity with Saidakhmetov prior to his introduction via Habibov.

b. Direct evidence affirmatively contradicted any involvement by Kasimov in the ISIS-fundraising "Tea Party" where Habibov testified that he had no

knowledge of such involvement despite being familiar with the group, its members, and its activities in depth.

c.    No direct evidence indicated Kasimov's awareness of the Tea Party's existence or its membership.

d.    No direct evidence indicated that Habibov had shared his support for ISIS with Kasimov.

e.    Direct evidence affirmatively indicated that Kasimov did not have ISIS vouching contacts where Habibov called him and asked if he was in touch with various ISIS "connections" but Kasimov was unaware of their identities or involvement.

f.    No direct evidence indicated that Kasimov had ever supported any other individual's travel to ISIS, where Habibov explicitly indicated he had no such knowledge.

g.    No direct evidence indicated that Kasimov agreed with the decision by any other individual to travel to Syria to fight for ISIS, where Habibov's discussions with Kasimov were limited to awareness that other individuals in their community had so traveled and no other evidence was introduced indicating their opinions about it.

h.   No evidence of any kind indicated that Kasimov had pledged any loyalty to ISIS, where text messages Kasimov had exchanged and Habibov's testimony contained no such indication and included only vague references to ISIS or made no references at all.

i.   No direct evidence indicated that he had seen, agreed with, supported or promoted ISIS propaganda of the sort found on his phone.

j.   Direct evidence affirmatively indicated that Kasimov was only connected to other co-defendants and alleged ISIS fighters, such as "Mirsad," Zakirov, and Saidakhmetov, through Habibov, who in turn indicated that he met Kasimov through legal means.

36.   Unable to produce any direct evidence of Kasimov's knowledge that Saidakhmetov was fighting specifically for ISIS, the Government relied entirely on circumstantial evidence.

37.   But subject to the legal framework discussed supra and discussed in more detail herein, this circumstantial evidence was so meager that it was, at worst, equally consistent with Kasimov believing that Saidakhmetov was fighting for another group in Syria or engaging in other activities altogether. Viewing all evidence without indulging in speculation but in the light most favorable to the Government, this evidence necessarily required any

reasonable juror to entertain a reasonable doubt as to whether Kasimov knew that Saidekhetov was going to fight <u>for ISIS</u>.

**II.A.3) The Specifics of Kasimov's Alleged Offense Conduct and the Situation in Syria.**

38.    This case is unique in some ways: Kasimov stands accused of providing material support to an organization that shares a radical ideology not only with other groups in other parts of the world, but with other organizations in its own area of influence with whom it is/was at odds in Syria. ISIS' radical ideology is not limited to ISIS: other groups of a "terrorist nature" in Syria share its worldview. <u>See</u> Statement of Facts, Sec. II, para 8. While some of those groups may be designated as terrorist organizations, others may not be and no evidence regarding their legal status was produced at trial or alleged in the indictment.

39.    This reality significantly undercuts the probative value of much of the Government's circumstantial evidence. As discussed <u>supra</u>, a vague understanding of doing something wrong or even criminal is insufficient. Hence, evidence that is equally consistent with Kasimov believing he could be supporting another group that shares ISIS' goals or ideology is necessarily insufficient.

40.     The government's summary of the record evidence, <u>supra</u> at Statement of

Facts, IV.B, para. 98 was embellished and misrepresents the actual record. A

close examination of the record cited by the Government in particular and

the record more generally strongly indicates that the Government's

circumstantial case was misleading and that in fact, the record did not

contain sufficient evidence to ensure that any reasonable trier of fact could

conclude that Kasimov' acts were intended to support ISIS beyond a

reasonable doubt.

**II.B) The Government's References to Coded Language Are Not Sufficiently Probative of Kasimov's Knowledge of Supporting ISIS Where Even a Co-Conspirator Would Not Have Understood Them to be Codes and Where Kasimov's Reactions Do Not Reasonably Indicate So.**

41.     At trial, the Government relied in part on circumstantial "code" evidence of

secret codes and furtive language. <u>See</u>, <u>e.g.</u> <u>United States v. Labat</u>, 905 F.2d

18 (2d Cir. 1990) (defendant's "furtiveness" and use of the code word "shoe"

for a kilogram of heroin permitted a jury to find that defendant agreed to join

a conspiracy to distribute at least one kilogram of heroin); <u>United States v.</u>

<u>Williams</u>, 2024 U.S. App. LEXIS 2115 at *2 (2d Cir. 2024) (""The jury

could conclude that Williams' references during his calls to the bag's

contents were code for drugs").

42.    But the evidence presented by the Government is noticeably flawed. At the outset it is worth noting that much of the government's code evidence involved other co-conspirators, and no evidence was presented of Kasimov using the codes. For example, despite claiming that Kasimov understood that Habibov's references to "pencil" as a codeword for weapon during summations, none of the evidence presented indicated that Habibov ever used this term with Kasimov. Similarly, Habibov's references to "toy" as a code for weapon was not shared with Kasimov. See Statement of Facts, IV.B, para. 80.

43.    But more to the point, even accepting as true Habibov's indication that some of the language he used was coded, the evidence needed to establish that Kasimov understood the language to be coded, and that this understanding established, in conjunction with other evidence, support for ISIS. While one might compare the "shoe" in Labat to the "pencil" or "toy" that Habibov discussed with other co-conspirators, such obviously coded terms were not used with Kasimov.

44.    Here, even assuming arguendo that Kasimov was a co-conspirator, the alleged codes could not have been reasonably understood to mean anything than their plain meaning; or, alternatively, where some of the language may

have been "furtive," the evidence was too ambiguous to support a reasonable inference of knowledge by Kasimov.

45. In any case, any knowledge that could be attributed to Kasimov as a result of the evidence cited, even based on unreasonable speculation, would not have established his knowledge that Saidakhmetov was fighting for ISIS specifically and therefore adds nothing. <u>See</u> Argument, II.A.1 paras. 24-32, <u>supra</u> case law prohibiting projection of co-conspirators' state of mind onto defendant; case law establishing that a defendant's vague understanding that something illegal was taking place was insufficient to establish requisite knowledge for a specific intent crime).

46. Addressing the code evidence specifically:

a. <u>"Brother"</u>

i. The government did not mention the extensive use of the term "brother" by various individuals throughout the case as a "code" during summations, even though it is the only "code" that specifically refers to ISIS. Nonetheless, Saidakhmetov indicated that he used the term "brothers" to refer to ISIS. However, he also mentioned that this term was used in person with other co-conspirators where ISIS was discussed openly, indicating that the term was not truly a code. <u>See</u> Statement of Facts, Sec. III, para 42.

ii. In any case, the term "brother" is of such common parlance to mean a male from a fellow kinship group that it is difficult to conclude that such language could constitute a code even otherwise. See, e.g. Brother Definition, https://www.dictionary.com/browse/brother (visited Feb. 15, 2024) (defining "brother" to mean "a male numbered among the same kinship group, nationality, ethnicity, profession, etc., as another; an associate; a fellow member, fellow countryman, fellow man, etc.").

b. "Bus Ticket"

i. Plainly, as Saidakhmetov was traveling from the United States to Turkey to Syria, and also within the United States, travel by land and without a direct flight would have been likely if not necessary, particularly given the fact that Syria was described extensively as an armed conflict zone with rival groups, including the government of Syria, controlling much of the country.

ii. As such, even assuming Kasimov was a co-conspirator and even crediting Habibov's claim that "bus ticket" was a code for a plane ticket, the evidence does not establish that a co-conspirator would have understood the term as a code at all: even a co-conspirator would have reasonably concluded that Habibov was genuinely talking about a bus ticket.

iii.   The difference between a bus ticket and an airplane ticket is not the difference between a shoe and a kilogram of cocaine. Habivov's indication that the language was coded would therefore only be probative of Habibov's intentions, rather than Kasimov's.

c.   <u>References to "Connections"</u>

i.   Describing Habibov's 11th hour call for assistance and effort to find ISIS-affiliated vouching contacts, the Government notes that Kasimov does not request any clarification about the sort of "connections" Habibov asks about.

ii.   But there is nothing inherently suspicious about asking someone if they have "connections" in a foreign country to assist someone who is traveling there from the United States, and such a question would not trigger confusion or require clarification whether Kasimov believed Saidakhmetov was traveling for legitimate purposes such as learning at the Al Bukhari School as Habibov and Saidakhmetov had discussed, to fight for another organization, or to join ISIS.

iii.   Any alleged ISIS connections are made significantly less probative given evidence that Habibov and Kasimov had previously discussed the latter's connections in Turkey for entirely benign purposes, such as educational materials. <u>See</u> Statement of Facts IV.A, para 49, <u>supra</u>.

iv.   Of course, that the question is being asked by Habibov is significant because of Habibov's connections to ISIS; but they do not indicate Kasimov's level of knowledge, particularly where Kasimov responds equivocally ("Hmm") and negatively to the specific individuals Habibov asked about (discussed further <u>infra</u>).

v.    This conversation can therefore only be read as an ISIS fixer trying to determine what other individuals in their community know and what contacts they have; that Kasimov did not have the sort of connections Habibov was looking for contradicts any implication that Kasimov understood the "connections" to be ISIS connections specifically.

vi.   To the contrary: as Habibov began asking about specific points of connection, and Kasimov responds in the negative, Habibov determines that Kasimov is not as close to ISIS as he guessed. At best, this is only indicative of Habibov's state of mind.  <u>See</u> Argument, II.A.1 paras. 24-32, <u>supra</u>. (case law prohibiting projection of co-conspirators' state of mind onto defendant).

vii.  Of course, had Kasimov been aware that Habibov was an ISIS fixer, the conversation would be subject to a significantly more culpable interpretation. But as discussed <u>infra</u>, Habibov's testimony fails to support or

outright contradicts any indication that he shared his ISIS affiliation (as opposed to his more general ideological leanings) with Kasimov.

d.    "Here and There"

i.    The government claims that during the same conversation, Habibov's reference to travel "here and there" was a coded reference that Kasimov must have understood. But again: there is no reason to conclude that such terms were in fact "coded" at all.

ii.    When asked to clarify where he was referring to on another phone call with another co-conspirator, Habibov admitted that "there" was Syria; but because "there" is not a code but simply an adverb, this is probative of nothing.

iii.    At best, this simply constitutes evidence that Kasimov knew where Saidakhmetov might be traveling – not what he was traveling for, whom he was trying to join, or even that it was a secret. The rest of this conversation is discussed in greater detail infra.

e.    "That Thing"

i.    The record evidence indicates that Habibov used coded terms to refer to weapons in conversations with other co-conspirators. But talking to

Kasimov, Habibov only refers to "that thing" alongside food, both as preparations for Saidakhmetov for which he was raising money.

ii. Once again, the Government portrays a part of speech as a code that Kasimov must have understood given his lack of request for clarification.

iii. But Habibov had separately indicated through direct evidence that he had told Kasimov that he was sending Saidakhmetov to fight in Syria. Hence, even assuming Kasimov understood that "that thing" was a weapon, it would only prove that Kasimov knew what Habibov already indicated through direct testimony. It does not indicate Kasimov understood that Saidakhmetov was fighting for ISIS. See Argument, Sec. II.A.1, paras 28-29 (case law finding that general knowledge of suspicious or even illegal activity is insufficient).

f. "Is anyone around you?"

i. At trial, Habibov indicated that he asked if Kasimov, a taxi driver, was alone when calling to speak to him; Kasimov indicated that he had just dropped off a fare.

ii. Defendant-Appellant submits that this does not indicate anything suspicious: confirming that another person is alone for privacy purposes and to avoid disrupting their interactions with others is a normal part of telephone

etiquette and cannot reasonably indicate anything about the mental state of the person receiving such a question or answering it as Kasimov did.

**II.C) Political Views and Statements Expressed By or Attributed to Kasimov Are Insufficient to Prove the Requisite Mental State.**

47. The political viewpoint evidence put forward against Kasimov is distinct from the evidence put forward against other terrorism defendants: it is not combined with direct evidence and is considerably more vague.

48. For example, in <u>Farhane</u>, 634 F.3d at 144-146, evidence establishing conspiracy and attempt to provide material support to the Al Qaeda FTO was sufficient where defendants not only voiced interest in "jihad" and "mujahideen" but specifically preached support for al Qaeda leader Osama bin Laden, told an undercover agent that they wanted to join al Qaeda as a doctor and martial arts teacher, formally swore allegiance and promised to support al Qaeda, and discussed codes that defendants understood would be provided to a trusted al Qaeda operative.

49. In <u>United States v. Aref</u>, 2007 U.S. Dist. LEXIS 12228, 71-74 (N.D.N.Y. 2007), evidence was sufficient to establish requisite knowledge for 2339(B) conspiracy and attempt charges against an imam involved in a terrorism sting operation to provide weapons to the Jaish-e-Mohamed ("JEM") FTO. That evidence included a conversation between the defendant and an

undercover agent in which the agent admitted his JEM affiliation and the defendant explicitly cautioned him to avoid working with JEM because JEM was a terrorist organization, thereby indicating knowledge.

50. Here, even the sort of warped depiction of the opinions Kasimov expressed are at best vaguely consistent with those of ISIS – an insufficient indication given that ISIS was admittedly fighting opponents who also committed atrocities and who were also viewed throughout the world with disgust and horror, such as the government of Syria, and which was one of several groups that adopted such ideology. See Argument, Sec. II.A.3, supra.

51. Of course, Kasimov's political views per se are not what is important; rather, the Government alleged that these views were indicative of his requisite knowledge that the co-conspirators were supporting ISIS specifically. As such, Kasimov's statements and points of view, seen in the most negative light, must indicate not only support or sympathy for ISIS, but lead to the reasonable non-speculative inferences that Kasimov supported ISIS specifically rather than other groups that might share its ideology in Syria. Further, the support must be sufficient to indicate to co-conspirators understood from these opinions that they could and did share the identity of

the ultimate recipient of the material support with him. A close examination of the statements made by or attributed to Kasimov indicate otherwise.

52.   First, several of the comments made by Kasimov plainly do not indicate support for ISIS specifically at all.

a.   Kasimov indicated to Mahliyo that "pious ones" were going to Gaza. There was no ISIS presence in Gaza. And where ISIS considers anyone who is not ISIS to be "kafir," this directly contradicts ISIS sympathies. <u>See</u> Statement of Facts, Sec. II, para. 24.

b.   Importantly, Kasimov indicates that the same "pious ones" were going to "Syria, or at least Iraq". Extensive expert testimony indicated that ISIS does not see Syria and Iraq as separate territories, but rather considers itself to be a singular governmental entity. Indeed, at the time the comments were made, ISIS no longer referred to itself as "the Islamic State in Iraq and Syria" and instead referred to itself as "Islamic State" to signify its generalized authority over Muslims. It is unreasonable to conclude that anyone with the kind of sympathies toward ISIS that must necessarily be attributed to Kasimov – as opposed to generalized sympathy toward some of its beliefs – would draw such a distinction. <u>See</u> Statement of Facts, Sec. II, paras. 12-14.

53. In addition, Kasimov indicated his disagreement with an ISIS sympathizer and the leader of the Tea Party, Kozim Gafurov, about the latter's reading of Islamic law, openly violating that person's belief that SMS is proscribed between suitors and women. See Statement of Facts, Sec. IV.A, para 61.

54. The Government pointed out other statements attributed to Kasimov that are more consistent with ISIS' views. But the argument was misleading. For example, both Kasimov's own statements and the statements attributed to him by Habibov comparing Saudi Arabia and ISIS indicate that Kasimov was willing to live under the rule of Saudi Arabia – ISIS' opponent – even though it was living under ISIS rule that was "preferable". See Statement of Facts, Sec. IV.A, para 56. Given the animosity between ISIS and Saudi Arabia, Kasimov's willingness to live in Saudi Arabia indicated at best a philosophical statement comparing the two regimes – not loyalty to either. That someone is willing to criticize a government relative to another government is hardly evidence of loyalty to either, much less sufficient evidence.

55. Similarly, Kasimov's lack of explicit agreement with an anti-ISIS imam – without any explanation of the nature of the disagreement beyond the fact that the criticism was made from the United States – at best indicates that

Kasimov held views that did not necessarily contradict ISIS about every topic. Such evidence does not reasonably indicate loyalty.

56. Finally, Kasimov's general statements about "jihad" – particularly when paired with places that have no ISIS presence, discussed <u>supra</u>, and amid evidence that many groups in Syria shared "radical ideology,"  similarly fail to provide any meaningfully probative significance about any loyalty to ISIS <u>specifically</u>.

**II.D) Kasimov's Interactions with Co-Conspirators Does Not Establish Requisite Knowledge or Intent**.

57. It is beyond dispute that Kasimov's association with co-conspirators like Habibov or Saidakhmetov alone is sufficient to establish his culpability. <u>See</u> Argument, Sec. II.A.1 at 29.

58. The Government needed to establish beyond a reasonable doubt that the association involved Kasimov's knowledge that the individuals involved were supporting ISIS specifically and in such a manner that would leave no reasonable doubt as to his own level of knowledge and participation. <u>Cf.</u> <u>United States v. Rahman</u>, 189 F.3d 88, 124 (2d Cir. 1999) (Sufficient evidence for involvement in terrorism conspiracy where defendant "was in constant contact with other members of the conspiracy, that he was looked to as a leader, and that he accepted that role and encouraged his co-conspirators

69

to engage in violent acts…"); and United States v. Ghayth, 709 Fed. Appx. 718, 722 (2d Cir. 2017) (Sufficient evidence for knowledge of conspiracy to support Al Qaeda rather than the Taliban where Defendant actively sought out head of Al Qaeda and made speeches with him in advance of Al Qaeda attacks).

## II.D.1) Co-Conspirators other than Habibov

59.  At the outset, Defendant-Appellant notes how the Government exaggerated Kasimov's alleged ISIS ties: while the Government listed off individuals it claimed to be ISIS fighters that Kasimov knew, all of these individuals save one were introduced to Kasimov by Habibov.

60.  Habibov testified that he personally arranged to have Kasimov move into the Bay Parkview apartment, where Mirsad and Habibov's business partner, Akmal Zakirov, lived.[3]

61.  No evidence was provided indicating that Kasimov had any ties to these individuals other than the apartment procured by Habibov.

---

[3]While it was not contested during the trial, Defendant-Appellant notes that a brief discussion during sentencing indicates that "Mirsad" was never Kasimov's roommate at all, but vacated the apartment prior to Kasimov's arrival. Sentencing at 33-34. Nonetheless, Defendant-Appellant addresses the evidence as it was presented at trial.

62. Similarly, no evidence was put forward indicating Kasimov had ever met Saidakhmetov prior to the incident and their interactions indicate that they were meeting for the first time.

63. In effect, virtually all of Kasimov's alleged ISIS ties went through Habibov, who testified that he had legitimate business relationships with Kasimov throughout this period and did not discuss politics with him until considerably later. That Kasimov roomed with some of these people is therefore of little probative value if not irrelevant.

64. The sole exception to this is Kasimov's alleged friendship with Kozim Gafurov, whom Habibov described as the "leader" of the Tea Party.

65. But the evidence in question does not provide any reasonable inference that Kasimov knew of, much less shared, Gafurov's involvement in ISIS.

66. Specifically: Kasimov disagreed with Gafurov's religious and ideological views.

67. More crucially, Habibov gave extensive testimony describing the Tea Party, indicating that he knew Gafurov was the leader, that it had at least twenty members, that it had sent at least four people to Syria, and that he was involved in its fundraising, including through clandestine means: yet he had "no knowledge" of Kasimov's involvement in the Tea Party. Hence, there is

no credible evidence of Kasimov's relationship to Gafurov beyond generalized friendship that he might share with anyone in the Uzbek Muslim immigrant community.

68. Similarly, when Kasimov was asked by Habibov about individuals who Habibov contended to be ISIS contacts, Kasimov expressed no knowledge of the individuals or their involvement in ISIS. <u>See</u> Statement of Facts, Sec. IV.B at paras. 70-77.

69. Instead, Habibov informed him that these individuals knew each other. <u>Id</u>.

70. And while Kasimov allegedly knew <u>about</u> individuals who traveled to ISIS, no evidence was introduced indicating he knew of their activities in advance or agreed with these activities.

71. Finally, Kasimov knew of Saidakhmetov only through Habibov and no evidence indicates he had any prior interaction with him.

72. Independently of his relationship with Habibov, discussed <u>infra</u>, Kasimov's knowledge and interactions with these individuals, if any, is insufficient for a reasonable jury to infer that Kasimov was aware he was sending Saidakhmetov to support ISIS specifically.

**II.D.2) Kasimov's Interactions with Habibov Specifically**

73. Of course, there is no doubt in the record that Kasimov was friends with Habibov, who testified that he had originally met Kasimov in benign circumstances.

74. At some point, Habibov and Kasimov began discussing ISIS-related topics.

75. But his discussions were unlike Habibov's relationship with Saidakhmetov – which involved Habibov's knowledge that Saidakhmetov supported ISIS specifically insofar as Saidakhmetov had told him so and also indicated uncritical support for a "caliphate," which only ISIS had declared.

76. Instead, Habibov was unable to testify that he was aware of anything more than a lack of agreement by Kasimov with some of ISIS' critics, such as an American imam or Saudi Arabia.

77. Habibov testified that after conversations with Kasimov, it was Habibov that determined that Kasimov would not mind supporting Saidakhmetov's plan.

78. But Habibov's personal beliefs about Kasimov's sympathies are his own guesses and speculation and indicative of Habibov's mental state – not Kasimov's.

79. Any probative significance of Habibov's conclusions about Kasimov are further undercut by the fact that Kasimov's personal views are, as discussed supra, consistent with the views of many different organizations and

Habibov was only able to indicate, at worst, that Kasimov shared generalized sympathies with radical causes.

80.　This is wholly unlike his relationship with Saidakhmetov, which was squarely about ISIS.

81.　Additionally, Habibov's phone call to Saidakhmetov discouraging him from sharing any details about their "business" together upon introducing him to Kasimov further undermines any suggestion that Habibov revealed the ultimate goal with Kasimov.

82.　A reasonable jury could not have concluded, based on Habibov's testimony, that such ties had been adequately conveyed simply because of Habibov's subjective beliefs.

83.　In sum, evidence presented regarding Kasimov's relationships and interactions with other co-conspirators were too speculative to indicate that he knew that the plot was directed toward support for ISIS.

**II.E) The ISIS Videos on Kasimov's Phone Are Not Probative Where the Government's Case Indicated that Such Videos were Shared Widely By Mainstream Outlets and No Evidence Was Put Forward Establishing How or Why They Were on His Device.**

84.　Much of the government's case for Kasimov's knowledge is premised on the presence of ISIS propaganda videos on his device. But their probative significance is drastically undercut by the Government's own case,

indicating that ISIS propaganda videos were shared widely by mainstream news outlets across the world, removing any argument that even knowing presence of such videos on a person's phone is meaningfully probative of support for their contents. <u>See</u> Statement of Facts, Sec. II, paras 25-30.

85. Furthermore, while the Government's expert indicated that the videos were "quintessential ISIS propaganda" based on his expertise, no evidence – including the videos themselves – would have indicated that they were as such to a lay viewer.

86. Courts have noted that given the nature of online communications, the presence of terrorist materials on a person's device alone cannot be used to establish a defendant's knowledge or requisite intent in a terrorism offense or for the purpose of a terrorism enhancement. <u>See</u>, <u>e.g.</u> <u>United States v. Alhaggagi</u>, 978 F.3d 698, 703 (9th Cir. 2020) (Court erroneously applied "terrorism enhancement" over defendant's use of internet chatroom "replete with posts praising ISIS, denouncing the United States, and planning to 'kindle strife and chaos'" because there was "no evidence that [the defendant] saw those posts, opened [social media] accounts because of those posts, or had contact with the authors of the posts"); <u>and</u> <u>United States v. Robertson</u>, 2015 U.S. Dist. LEXIS 82693 at 14 (M.D. Fla. 2015) ("extremist

beliefs" in small number of materials amid thousands of other works on defendant's computer cannot be attributed to defendant absent proof that he "ever accessed these particular documents, much less that he took their extremism to heart").

87.  This logic has also been applied by courts to analyze scienter requirements for other crimes involving possession of suspect or contraband materials. See e.g. United States v. Miller, 527 F.3d 54, 67 (3d Cir. 2008) (knowledge of unlawful child pornography cannot be automatically assumed by presence of such materials on defendant's computer, and courts consider other factors such as the number of images, whether the content of the images is obvious from the filename, and whether defendant knew how to access them); and United States v. Romm, 455 F.3 990, 997-1001 (9th Cir. 2006) (images stored in cache file inaccessible to normal users, on its own, does not establish knowing possession or receipt of child pornography).

88.  Where terrorist propaganda materials have been used to indicate knowledge, sufficient evidence has been found when an individual not only views such material but when their actions indicate a nexus between alleged unlawful behavior and the ideas in the materials. See, e.g. In re: Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh, 552 F.3d 93, 115 (2d Cir. 2008) (terrorist

materials were sufficiently connected to defendant where he expressed his anger that the bomb instructions in them did not work); and see United States v. Ullah, 2020 U.S. Dist. LEXIS 245691 at *9 (N.Y.S.D. 2020) ("The record evidence, taken in the light most favorable to the government, amply establishes that Defendant acted at ISIS's direction by heeding the call of the organization's propaganda and recruiting materials. Defendant informed arresting officers that he had viewed [an ISIS propaganda video] which encourages attacks similar to the one he carried out...the jury also saw several ISIS propaganda videos recovered from Defendant's computer and heard testimony from the government's expert...explaining those videos and how ISIS used them to inspire attacks to advance its cause. The jury also heard testimony about Defendant's pre-attack Facebook post, which...contained language that serves as an ISIS "rallying cry." Finally, and perhaps most importantly, Defendant told police that he carried out the attack "for the Islamic State.") (emphasis added).

89. Note also that the Government's case included at least one other instance in which Kasimov watched video by someone allegedly critical of ISIS. See Statement of Facts, Sec IV.A at para 51.

90.    Absent evidence of how or why the ISIS propaganda videos were on his

device and his interaction with them, these videos and their contents cannot

be reasonably imputed to Kasimov. At worst, they indicate weak evidence of

association, similar to that described <u>supra</u> in Argument, Section II.D.

**II.F) Kasimov's Alleged Eagerness and Other Vague Signs of Support Fail to Establish the Requisite Knowledge.**

91.    Record evidence showed Kasimov's eagerness to support Saidakhmetov by

offering money and a ride, choosing to see him off despite never having met

him, and responding to his CHS co-traveler's question about joining the

travelers in Turkey with "Inshallah".

92.    Plainly, these pieces of evidence indicate that Kasimov was eager to support

<u>what he believed</u> Saidakhmetov was doing; such evidence is not probative of

whether that included an understanding that Saidakhmetov was traveling to

join ISIS.

**II.G) The Totality of the Evidence Does Not Salvage Its Insufficient Character**.

93.    While individual pieces of evidence may not create sufficiency, a reviewing

court must consider the evidence as a whole. But here, the evidence in its

entirety does not salvage an insufficient case. To the contrary, many of the

pieces of evidence introduced by the government weaken each other.

94. While Kasimov's relationship with Habibov is suspicious, it also indicates that it is the source of his relationship with other co-conspirators, undercutting the implication that Kasimov was part of the group's knowing activities.

95. This is even more the case given the evidence from Habibov expressing ignorance about Kasimov's involvement in the Tea Party and inability to explicitly indicate any knowledge about Kasimov's alleged support for ISIS, and the fact that Habibov's relationship with Kasimov began as one of many innocent relationships among people of the same cultural background and industry.

96. The circumstantial strength of any associations is even further undermined by Kasimov's lack of knowledge about any potential ISIS vouching contacts or their relationships with each other when asked.

97. And where Kasimov lacked knowledge about ISIS vouching contacts, and was not a member of the Tea Party, the likelihood that ISIS videos were on his phone as a result of an intentional effort to find or promote these videos rather than receiving them as a result of their widespread dissemination is increased.

98. And where the Government's evidence of Kasimov's political opinions came from a discussion about a video he allegedly expressed no agreement with, the implication would be that Kasimov's media consumption regarding ISIS involved simply paying some attention to the topic.

99. While the Government emphasized Kasimov's personal contacts with other co-conspirators, the evidence of Kasimov's relationship with Habibov indicated that Kasimov was not in on the same "codes".

100. Similarly, the political statements Kasimov made or which were attributed to him often contradicted the ideological zealotry of ISIS or the other co-conspirators with whom he was allegedly associated.

101. In short, the weakness of each category of evidence the Government introduced ultimately contributed to the weakness of other categories of evidence.

**II.H) Preservation.**

102. This issue is preserved where trial counsel raised it in a Rule 29 motion which was denied. ECF Dkt. No. 428.

**III) Evidence of Kasimov's mental state was also insufficient to establish that he held the requisite knowledge that ISIS was designated as a foreign terrorist organization, or engaged in terrorism, or engaged in terrorist activity.**

103. 18 USC Sec. 2339(B) contains an additional knowledge requirement to establish sufficiency: a Defendant must be aware that the organization he is materially supporting is designated as a terrorist organization; or that it engages in "terrorism," defined by Sec. 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1999 as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents"; or that it "engages in terrorist activity" as defined in Sec. 212(a)(3)(B) of the Immigration and Nationality Act (INA). Sec. 212(a)(3)(B)(iii) of the INA defines "terrorist activity" to mean a variety of illegal activities including hijacking or sabotage, the taking of hostages to compel behavior in others, attacks on internationally protected persons, assassinations, and the use of certain weapons to endanger the safety or others or cause damage to property, or the threat or attempt or conspiracy to do any of the foregoing. Sec. 212(a)(3)(B)(iv) of the INA in turn defines "engage in terrorist activity" to include a number of methods of complicity in terrorist activity, including committing, preparing for, gathering intelligence for, or soliciting funds or material support for terrorist activity.

104. Very little information was provided about Mr. Kasimov's personal knowledge about the ISIS organization. None of the statements attributed to Mr. Kasimov involve any statements of any kind about ISIS specifically. A brief review of the evidence presented indicates that the Government failed to prove beyond a reasonable doubt that Mr. Kasimov had the requisite knowledge of ISIS' nature as a designated terrorist organization or as an organization engaged in terrorism or terrorist activity.

105. First, although the Government provided evidence that ISIS has been designated as a terrorist organization and that the designation and updates to it were published in the Federal Register, no evidence was presented indicating that Mr. Kasimov had ever read the Federal Register or was otherwise aware of this designation.

106. Indeed, no evidence was provided indicating that anyone other than the Government expert himself was aware of the designation. Hence, to be sufficient, the Government would need to have proven that Mr. Kasimov was aware that ISIS was engaged in terrorism or terrorist activity, as defined supra. There is little doubt that ISIS was engaged in such activities. But the Government was required to present evidence that Mr. Kasimov personally knew of such activity. A brief overview of the evidence indicates otherwise.

107.  First, for the reasons aforementioned <u>supra</u> in Argument, Sec. II.E, there is no evidence that Mr. Kasimov actually watched any of the ISIS videos found on his phone.

108.  Nonetheless, there is no indication that Mr. Kasimov or anyone else would have known that the videos in question, and by extension, any terrorist activity in them, pertained to ISIS specifically. The government presented only testimony from experts indicating, based on their own subjective and expert knowledge, that the organization in the video was ISIS, citing a watermark identifying one of the videos to be made by an ISIS publishing house, and the ISIS flag. While someone who is familiar with ISIS may have known these things – such as a counterterrorism expert – no evidence was put forward suggesting that Kasimov would have known them.

109.  Second, while Mr. Kasimov speaks in text messages and elsewhere about abstract concepts like "jihad," there is no indication that he was referring to ISIS. Finally, while other defendants spoke to Mr. Kasimov *about* ISIS, there is no indication of what they said or whether or not the discussion included any mention of ISIS' terrorism or terrorist activities.

110.  This might be contrasted with the testimony regarding individuals like Saidakhmetov, in which trial testimony indicated Saidakhmetov's familiarity

with ISIS' agenda and desire to fight for them. See Statement of Facts, Sec. III, paras. 32-33.

111. The only suggestion that Mr. Kasimov had any direct familiarity with ISIS indicated his alleged support for ISIS' religious practices, based on Habibov's off-hand remark that Kasimov wanted to live in Syria under "Islamic State".

112. The Government cannot impute knowledge of ISIS' terrorist activities or terrorism simply by alleging general familiarity with an organization's religious or political ideology without rendering the statutory language superfluous.

113. Mr. Kasimov's level of knowledge – or lack thereof – can be directly contrasted with sufficient knowledge and familiarity with terrorist activities cited in the cases in Argument Sec. III, supra.

114. This argument is preserved where the challenge to sufficiency was properly raised by trial counsel through a Rule 29 motion. ECF Dkt. No. 428.

**IV) The district court wrongly denied a First Amendment jury instruction.**

115. There is of course no "per se barrier to the admission of evidence concerning one's beliefs and associations...simply because those beliefs and associations are protected by the First Amendment." United States v. Kaziu, 559 Fed.

Appx. 32, 35 (2d Cir. 2014) (citing <u>Dawson v. Delaware</u>, 503 U.S. 159 (1992)).

116.  Nonetheless, the risk of a jury imposing a penalty upon a defendant simply for having unpopular views is a real one, which courts have guarded against with jury instructions. <u>Kaziu</u>, 559 Fed. Appx. at 35; <u>Salameh</u>, 152 F.3d at 112 (rejecting First Amendment challenge where prejudicial effect of terrorist materials was ameliorated by trial court's instruction that mere possession of literature is not illegal and "that the defendants' political beliefs were on trial'); <u>cf</u>. <u>United States v. Caronia</u>, 703 F.3d 149, 161 (2d Cir. 2012) (jury instructions and government's summation "would have led the jury to believe that [defendant's]...speech was, by itself, determinative of his guilt").

117.  The Government did indicate that mere possession of ISIS videos was not unlawful, with no mention of the other statements and political opinion evidence introduced. Tr. 627.

118.  However, the issue was not simply possession of the videos; indeed, given the Government's expert indicating the widespread sharing of ISIS materials, it would have been doubtful that any reasonable juror would have concluded that possession alone was unlawful.

119. Instead, the risk was that the jury may have concluded that insofar as Kasimov's opinions in some way overlapped with ISIS, they could conclude that the necessary mental state was established.

120. Hence, the district court should have ameliorated any confusion by providing a First Amendment instruction.

121. This error was not harmless. As trial counsel noted, First Amendment-protected activity formed the brunt of the evidence of Kasimov's requisite knowledge, which was insufficient and meager in its own right.

122. The failure to ensure that the jury was instructed not to penalize Kasimov for any political views they perceived him to hold was therefore a serious risk.

123. Additionally, in light of the deprivation of Kasimov's right to testify, Argument, Sec. I, <u>supra</u>, this error is made even more harmful: the jury not only heard highly prejudicial remarks attributed to Kasimov without any opportunity by him to contradict or contextualize any such statements.

124. The Court should reverse Kasimov's convictions on this basis.

125. This error was preserved pursuant to trial counsel's objection. Tr. 591-592.

**V) Kasimov's sentence should be reduced to time served where the "terrorism enhancement" was wrongly applied.[4]**

---

[4] Arguments in this section assume Kasimov's guilt for the sake of argument and should not be read to undermine Kasimov's challenges to the sufficiency of the evidence.

126. A district court's interpretation of Guidelines calculations is reviewed de novo. United States v. McCrimon, 788 F.3d 75, 78 (2d Cir. 2015).

127. At the outset, the district court failed to provide a meaningful explanation of why it chose to impose the terrorism enhancement.

128. While the Court's statement at sentencing referred to the dispute between the Government and Defense, it did not include any finding of fact regarding the government conduct prong specifically beyond adopting the Government's calculation.

129. Absent such a statement and independently of the merits, this warrants resentencing. Compare United States v. Banol-Ramos, 516 Fed. Appx. 48-50 (2d Cir. 2013) (defendant's willingness to assist FTO in their activities was insufficient on its own to determine that the terrorism enhancement applied).

130. But accepting that the district court's analysis was the same as the Government, the terrorism enhancement was wrongly applied to Kasimov, where Kasimov's alleged material support was not "calculated" to affect government conduct.

131. The calculation requirement requires that Kasimov had the specific intent to further the behavior the Government cites, namely fighting the governments of Iraq or Syria.

132. But the Government introduced evidence of many other acts that ISIS took, including fighting its rivals and attack people who were not involved in government.

133. And Kasimov is accused of assisting someone in traveling to join ISIS; not any violent acts they may have sought to undertake. Compare United States v. Stewart, 590 F.3d 93, 137-140 (2d Cir. 2009).

134. Absent evidence that Kasimov's material support was calculated to contribute to attacks on the Iraqi, Syrian or other governments specifically, the terrorism enhancement should not have been applied.

135. As such, the sentence was excessive and should be reduced to time served.

136. This error is preserved where it was raised during sentencing. ECF Dkt. No. 505.

## **CONCLUSION**

For the foregoing reasons, Kasimov's convictions must be reversed; in the alternative, his sentence should be reduced to time served.

Dated: March 15, 2024.

Respectfully submitted,

/s/ Amith Gupta

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32</u>

I hereby certify that the attached Brief of Defendant-Appellant Dilkhayot Kasimov is in compliance with Federal Rule of Appellate Proecure 32 and with the local rules of the Second Circuit. The brief was printed in 14-point proportional font and, including footnotes and headings, contains 17,653 words.

A motion to file an oversized brief has been contemporaneously filed with this Court.

Dated: March 15, 2024.

/s/ Amith Gupta